MRS MEDA GREENE ET AL V. MANDY GARRETT WHITE ET AL.

No. 7658. Decided February 26, 1941.
Rehearing overruled July 23, 1941.
(153 S. W., 2d Series, 575.)

362

*Carney & Carney* and *Ben A. Harper*, all of Atlanta, Texas, *Walace Hawkins* and *Chas. B. Wallace*, both of Dallas, *Vinson, Elkins, Weems & Francis, Thos. Fletcher*, all of Houston, *King, Wheeler & Fulton* and *Wheeler, Atchley & Vance*, all of Texarkana, *Conner & Conner*, of Eastland, *Dan Moody*, of Austin, and *Judge F. A. Williams*, of Galveston, for plaintiffs in error.

The Court of Civil Appeals erred in finding that Alex and Mandy Garrett held adverse possession for a period of ten years, as the evidence showed that for a portion of that time their possession was merely an occupancy of a house thereon, without deed, because of the actual physical possession of said land was held by the North Texas Lumber Company, its assignees and grantees, who had the continuous use of same for a lumber camp and that said premises were in custodia legis a part of the time claimed. Adams v. Brown, 113 S. W. (2d) 310; W. T. Carter & Bro. v. Holmes, 131 Texas 365, 113 S. W. (2d) 1225; Texas & N. O. Ry. Co. v. Speights, 94 Texas 350, 60 S. W. 659.

As to their rights under the mineral lease. Humble Oil & Ref. Co. v. Clark, 126 Texas 262, 87 S. W. (2d) 471; Stone v. Jackson, 210 S. W. 953; 20 Tex. Jur. 308.

*Wynne & Wynne* and *Philip Brin*, of Longview, *Newland & Cornett*, of Linden, *Rodgers & Rodgers* and *Wm. Hodges*, of Texarkana, *W. B. Chauncey*, of Wichita Falls, *Lawler, Wood & Childress, Virgil Childress* and *R. O. Kenley*, all of Houston, for defendants in error.

Defendants failed to prove a superior paper title to the land in the Davenport survey claimed by them to be the land in controversy herein. Yates v. Darby, 133 Texas 593, 131 S. W. (2d) 95; Texas & Pac. Ry. Co. v. Reed, 88 Texas 439, 31 S. W. 1058;

Estoppel cannot be predicated upon an ambiguous deed, or one executed under mutual mistake as to the land intended to be conveyed, or one executed under a mistaken assumption of title in the grantor. Kuykendall v. Spiller, 299 S. W. 522; 19

Am. Jur., 642; Collum v. Sanger Bros., 98 Texas 162, 82 S. W. 459; Allen v. Boggess, 94 Texas 83, 58 S. W. 833.

MR. JUDGE SMEDLEY, of the Commission of Appeals, delivered the opinion for the Court.

The subject of controversy herein is the title to the oil, gas and other minerals in a tract of land in Cass County containing about 133 acres. Defendants in error Mandy Garrett White and others sued plaintiffs in error Mrs. Meda Greene and others for the title and possession of a tract of land described as being in the Robert Trammel survey and containing 154 acres. The first count of the petition is a formal action of trespass to try title. In another count the plaintiffs allege acquisition and ownership of title by adverse possession for a period of more than ten years.

Upon the conclusion of the taking of testimony and the introduction of evidence in trial before a jury, an agreement of settlement was reached between plaintiffs and two of the defendants, Willis and Brown, and judgment was rendered in accordance with such agreement by which title and possession of the 33.37 acres of the land sued for were awarded to said defendants Willis and Brown. The jury was unable to agree upon answers to special issues submitted to it and the court, on the motion of the defendants, plaintiffs in error here, withdrew the case from the jury and rendered judgment in favor of the plaintiffs for the title and possession of the surface estate only in the tract of 133 acres of land, being all of the land described in the plaintiffs' petition except 33.37 acres thereof awarded by reason of the settlement agreement to Willis and Brown, and rendered judgment in favor of the defendants for the oil, gas and mineral estate in the 133 acre tract.

The Court of Civil Appeals reversed the judgment of the trial court and rendered judgment in favor of defendants in error, plaintiffs in the trial court, for the title and possession of the mineral estate, as well as the surface estate, in the land in controversy and remanded the cause for trial of the issues as to damages. 129 S. W. (2d) 801.

As is shown by the opinion of the Court of Civil Appeals, there are three important questions in the case: First, whether

Alex Garrett and his wife, Mandy Garrett, who is Mandy Garrett White, one of defendants in error, acquired title to the land in controversy by adverse possession for more than ten years; second, whether the land in controversy is within the bounds of the James Davenport survey or within the bounds of the Robert Trammel survey; and third, what effect is to be given to a deed executed by F. M. Greene to Alex Garrett on March 2, 1910, conveying the land in controversy but reserving all minerals to Greene.

The Court of Civil Appeals held that the evidence conclusively shows that Alex and Mandy Garrett on March 2, 1910, had perfected title to the land in controversy under the ten years statute of limitations; that it is conclusively established by the evidence that the land in controversy is wholly within the Robert Trammel survey and entirely without the bounds of the James Davenport survey; and that the deed from Greene to Alex Garrett to date March 2, 1910, reserving the minerals to Greene, in no way affected or impaired the title that Garrett and wife had theretofore acquired to the minerals, as well as to the surface, by adverse possession.

It is our opinion, after carefully reading the statement of facts, that issues of fact are made by the evidence, both with respect to adverse possession by Garrett and wife and with respect to the question of boundary, and further that effect, to the extent hereinafter stated, should be given to the Greene-Garrett deed and the reservation of minerals contained in that deed.

Defendants in error did not prove a record title to the land in controversy in Alex Garrett or Mandy Garrett, or anyone claiming under them. Their documentary evidence seems to show that, if the 133 acres of land in controversy is within the bounds of the Trammel survey, the record title to the north part of said land was in North Texas Land & Timber Company and the record title to the south part thereof was in J. M. Adams in about the year 1890. They offered oral proof to show that one Aus Thomas lived in a house on the land in 1894, and for a few years prior thereto, and moved from it in 1894; that Alex Garrett and his wife moved into the house when Thomas moved from it and that Alex Garrett said that he bought the land or the place from Thomas. There is no evidence that either North Texas Land & Timber Company or Adams

conveyed the land in controversy or any part of it either to Thomas or to Garrett; and there is no evidence showing or tending to show that Thomas executed a deed conveying the land to Garrett, unless testimony that Garrett said he bought the land from Thomas and testimony that Garrett had deeds or title papers that he said Thomas gave him can be taken as evidence tending to prove that conveyance was made by Thomas to Garrett. There is no testimony showing by or to whom any such deeds or title papers were executed or what land was described in or affected by them. Defendants in error therefore rely for title upon adverse possession of the land by Alex Garrett and Mandy Garrett under the ten years statute of limitation.

1 Defendants in error take the position that the evidence so conclusively shows adverse possession of the land by Alex Garrett and his wife that, as a matter of law, all title was divested out of the record owners and vested in Garrett and wife. The evidence offered in support of this contention is the testimony of a number of witnesses that Aus Thomas moved on the land in about the year 1890, built a house and lived in it until sometime in 1894, when he moved off the land and Garrett and his wife moved upon it, that Garrett and his wife lived in the house and thereafter claimed and possessed the land and used it for a homestead until the trial of this suit. The evidence, however, does not, in our opinion, conclusively prove that Garrett and wife had for any period of ten years prior to the execution of the deed by Greene to Garrett on March 2, 1910, or prior to the ratification of that deed by Mandy Garrett, such exclusive, continuous, visible and hostile possession of the land in controversy as was necessary to invest them with title by adverse possession. W. T. Carter & Bro. v. Holmes, 131 Texas 365, 367, 113 S. W. (2d) 1225.

Much of the testimony as to possession and claim by Garrett and wife comes from interested witnesses, parties to the suit. The testimony as to the extent and nature of their possession and use is vague and indefinite. The witnesses refer to land known as the Garrett land or the Garrett place but there is very little evidence as to fences or adjoining lands defining the land claimed, possessed or used. The testimony as to fences enclosing the land and as to names of persons owning or claiming adjoining lands, whenever it is at all definite, has reference to the land claimed or possessed in 1912 or 1914 and thereafter. Two or three witnesses testified that Alex Garrett cleared and farmed small areas of the land in contro-

versy but the testimony does not show clearly the extent of the areas farmed or that such use of the land was continuous.

Mandy Garrett, one of defendants in error, like the other witnesses, failed to testify clearly and definitely as to the character of her possession and use of the property. The substance of her testimony is that she and Alex Garrett moved upon the place and thereafter lived on it and claimed to own it. When asked twice who moved off the place when she and Alex moved on, she answered "Nobody." She is a negro and cannot read or write but it does not appear from her testimony or otherwise that she was at the time of the trial mentally incompetent to the extent that she could not have given testimony, had such been the facts, definitely showing that her possession was continuous, exclusive and hostile.

In contradiction of testimony offered by defendants in error that Aus Thomas lived on the land for several years immediately before Alex Garrett moved upon it, witnesses for plaintiffs in error testified that Aus Thomas at such times lived on land in Louisiana and on the Brooks land, which is west of the 133 acre tract involved herein, and not on the said 133 acre tract. There is evidence in the statement of facts from which it may fairly be inferred that such possession as Alex and Mandy Garrett had was, during a long period not exclusive and not hostile but permissive. Evidence was offered and admitted showing that much of the north part of the land in controversy was in the possession of North Texas Land and Timber Company (its lessee and its lessee's receiver) which was grantee in a deed executed in the year 1889 conveying the north 56.73 acres. The timber company built and began to operate a logging tramway across the north part of the land in controversy in about 1890 and constructed and maintained, in its logging business, camps and houses for its employees, a commissary, a blacksmith shop, barns and skidways, which camps and other improvements were in part on the 133 acre tract and in part on adjoining lands. Witnesses testified that Alex Garrett worked in one of these camps, sawing logs for the timber company, and that he lived with his family in the company's camp. There is testimony that Garrett was living in the camp when the receiver for the timber company's lessee was appointed on December 1, 1894. One witness testified that Garrett lived in the timber company's camp until 1896 or 1897. There is testimony that the operation of the tramway ceased and it was removed in 1896, but that

nearly all the houses in the camp were left, that some of the employees of the company continued thereafter to occupy the houses, that some of the houses were sold and that a number of persons stayed in the houses until some time during the year 1900.

The conclusion may reasonably be drawn from the foregoing evidence that Alex Garrett, with his family, entered upon the land in controversy, not as a purchaser or claimant of title, but as an employee of the timber company, occupied a house or houses belonging to the company, with its permission and as its employee, and after the operation of the tramway and camps was discontinued, lived on the land for several years, probably until some time during the year 1900 or later, merely as the occupant of a house with permission or acquiescence on the part of the land owner or owners.

Our conclusion that the evidence does not show as a matter of law that Alex Garrett and Mandy Garrett had by adverse possession prefected title to the land in controversy on or prior to March 2, 1910, or on or prior to June 8, 1916, but is sufficient only to raise an issue of fact, is based in part on the evidence last discussed, but primarily upon the fact, which has hereinbefore been noted, that the evidence offered and relied upon by defendants in error to prove title by adverse possession is wanting in certainty and definiteness and does not show clearly that the possession was exclusive, continuous and hostile.

As has been said, careful consideration of the statement of facts leads to the conclusion that the question of boundary or the location of the Davenport survey is also one of fact. The Davenport survey of 770 acres was surveyed October 19, 1844, and was thereafter patented. The field notes describe the survey as beginning 94 varas west of the northwest corner of a survey of 320 acres in the name of J. H. Rives. Its lower northwest corner, its upper northwest corner and its northeast corner are described as marked by bearing trees and it is stated in the field notes that the bearing trees are all marked "J. D." The Robert Trammel survey was surveyed July 19, 1849, and was thereafter patented. The Trammel survey, according to its field notes, lies to the west, the north, the east and the south of the Davenport survey, following lines of the Davenport survey and calling to connect with several of its corners.

Defendants in error, in support of their position that the Davenport survey is so located that the land in controversy is not within its bounds but within a part of the Trammel survey lying to its east, offered in evidence testimony of expert surveyors who gave the results of their investigations on the ground and expressed their opinions that they had found and identified the true locations of certain corners and lines of the Davenport survey and of other surveys. This evidence was directed first to fixing the location of the northwest corner of the J. H. Rives survey, the position most strongly taken by defendants in error being that their evidence establishes beyond dispute the location of that corner and that the location of the Davenport survey, in accordance with the calls in its field notes, is correctly determined by beginning for its southeast corner at a point 94 varas west of the northwest corner of the Rives survey. The evidence offered by defendants in error to prove the location of the northwest corner of the Rives survey is not conclusively. It consists largely of opinions of the surveyors formed as the results of connections run from what they believed or assumed to be lines or corners of other surveys. For example, the surveyor Gamewell testified that, in endeavoring to determine the location of the northwest corner of the Rives survey, he began at what he "took to be" a corner of the Archer survey, went south to what he "took to be" the west line of the Hughes survey, and ran its record distance and the record distance of the Crowder survey until he found "an apparent corner, a stake." He testified that he found a sweet gum tree about 60 feet west of the stake with a little cross on it. This stake, it seems, is what the surveyor took to be the northeast corner of the Rives survey. The field notes do not call for a gum tree at this corner. The witness testified that he went thence west the distance called for in the field notes of the Rives survey and found a stake, and that when he had gone about the call distance he looked for the post oak described in the field notes and found the shell of a post oak tree with sprouts that had come out from it, which he "took to be" the original witness tree. From the point which he thus took to be the northwest corner of the Rives survey the witness ran west 94 varas, where he found a pine knot and three marked trees, none of which trees or marks was old enough to have been an original tree or an original mark. He ran thence along marked lines substantially the courses and distances called for in the field notes of the Davenport survey but found no trees that he could identify as original bearing trees, except that he found at the northeast corner as thus fixed by

him an old pine tree which he "took to be" an original witness tree. He testified that the several lines and corners of the survey as constructed by him were in his opinion the original lines and corners of the Davenport survey.

The evidence above referred to, together with similar testimony of two other surveyors and a number of Land Office maps showing the southeast corner of the Davenport survey to be a short distance west of the northwest corner of the Rives survey, constitutes, stated generally, the evidence mainly relied upon by defendants in error to prove the true location of the Davenport survey.

Plaintiffs in error offered the testimony of two experienced surveyors, together with other evidence, to prove the location of the Davenport survey to be about 1300 or 1400 varas farther east than the location in which the testimony of defendants in error's expert witnesses placed it, and thus to include the land in controversy within its bounds. The testimony of these surveyors as to what they found as evidence of marks of the original surveyor at and near the several corners of the Davenport survey as located by them is in substance as follows: At what in their opinions was the northeast corner of the survey they found a pine stake and a pine knot set near a fence corner and at a point south 39 west 13 1/2 varas from the stake an old pine tree buried in the ground. When the tree was taken out of the ground the witnesses found on it what they considerred the letters "J. D." The field notes of the Davenport survey describe one of the bearing trees at its northeast corner as a pine south 39 west 13 1/2 varas and state that all bearings are marked "J. D." A part of the pine tree, about ten or twelve feet of it above the root system, was cut off and exhibited on the trail and the witness pointed out to the jury the letters "J. D." cut on the tree. The witness testified that according to his count of the rings the tree was 108 years old when it went down. Both of the expert witnesses for plaintiffs in error expressed the opinion that the letters "J. D." on the tree were the mark of a surveyor.

The surveyor testified that, after running west 1917 varas from the stake near the buried pine tree, he found a pine knot and a buggy axle in a fence corner and a post oak stump south 58 east 8 varas from the pine knot and another post oak stump south 52 east 7 1/2 varas. The two post oaks described in the field notes of the Davenport survey as its bearing trees

at its upper northwest corner are at these courses and distances. From the pine knot last described the surveyor ran south and west in substantial conformity to the field note calls and found at the lower northwest corner of the survey as thus constructed a pine knot and rock pile and from them a pine stump hole south 14 1/2 east 13 varas and another pine stump hole south 62° 40' east 7 varas. The field notes describe pine trees as bearing trees at these corners and distances for the lower northwest corner of the survey.

The opinions of the surveyor, that the corners as above described and evidenced as stated represent original corners of the Davenport survey, are strongly corroborated by filed notes set out in deeds purporting to convey portions and subdivisions of portions of the Davenport survey and by the testimony of the surveyors that they retraced and identified on the ground many of the lines and corners described in such deeds.

On February 17, 1876, Stewart Nelson and wife and E. E. Watson and his wife, Mary C. Watson, being record owners of the Davenport survey containing 770 acres, conveyed to A. W. Robinson 162 acres described in the deed as being out of the southeast part of the Davenport survey and beginning at its southwest corner. This deed describes in detail the lines and corners of the tract conveyed, calling for creek and branch crossings, for rocks set at the corners and for marked bearing trees at each corner except the beginning corner. By careful survey on the ground one of the surveyors retraced the lines of this tract and found many of the natural and artificial objects called for, including marked bearing trees, in such way as thoroughly to identify the tract described in the deed as being the 162 acre tract lying immediately south of the 133 acres in controversy herein. One of the expert witnesses for defendants in error testified that he surveyed the north, south and east lines of the tract conveyed by the deed from Nelson and Watson to Robinson, that he found at its northeast corner the ash bearing tree marked "A. W. R.", and that he found a rock at its southeast corner. He depicted the Robinson tract on a map made by him and offered in evidence, noting thereon the deed, the parties, its date and the ash bearing tree and mark at the northeast corner of the tract. As there shown, the tract lies immediately south of the land in controversy.

On January 1, 1880, Stewart Nelson and wife conveyed to John Brooks and Thomas J. Cobb 500 acres of land, describing

it as being part of the James Davenport survey. As a part of an elaborate description by metes and bounds, the deed calls for the beginning corner to be at the southwest corner of the A. W. Robinson 162 acre tract, giving as bearing trees for that corner the trees described in the deed from Nelson and Watson to Robinson, and calls to corner with a corner of the Mary C. Watson tract lying north of the Robinson tract and to run with its west boundary.

Thereafter R. M. Huffhines, who was county surveyor of Cass County, subdivided the 500 acres into six tracts and the several persons who held title under John Brooks and Thomas J. Cobb executed in the year 1900 partition deeds conveying to the several parties thereto one or more of the said subdivision. The deeds conveying the 500 acre tract and the several partition deeds all contain full descriptions of the land conveyed, calling for bearing trees and many natural and artificial objects, unmistakably showing that the descriptions were made from actual surveys on the ground. The deed of the 500 acres at what it designates its northwest corner and the northeast corner of the Davenport survey calls for one of the bearing trees described in the original field notes of said survey and also for other bearing trees evidently marked when the survey of the 500 acre tract was made. Similarly, at the lower northwest corner of the Davenport survey and of the 500 acre tract the deed describes two bearing trees marked "J. D." at substantially the courses and distances of the two bearing trees for the northwest corner of the Davenport survey as given in the original field notes and also describes additional or new bearing trees. One of the expert witnesses for plaintiffs in error testified that he retraced on the ground the lines of the 500 acres and of the several subdivisions as described in the deeds. His testimony shows that he found many of the bearing trees and natural and artificial objects and lines described in the deeds, and that thus he identified the 500 acre tract described in the deed and subdivided on the ground as being the 500 acres lying immediately west of the land in controversy and the Robinson 162 acre tract.

On the death of E. E. Watson and his wife, Mary C. Watson, all of their property passed by will to R. M. Huffhines, who was Mrs. Watson's brother, and the inventory made in 1888 describes a part of the estate devised to Huffhines to be 110 acres of land in Cass County, a part of the James Davenport survey. R. M. Huffines, on June 19, 1907, conveyed to

F. M. Greene the tract of land lying north of the A. W. Robinson tract and east of the 500 acre Brooks tract. The deed describes the land as a part of the James Davenport 770 acre survey and as beginning at the northeast corner of that survey but its particular description by metes and bounds clearly identifies the land intended to be conveyed as the land in controversy herein. That particular description calls for the north line of the Robinson tract as the south boundary and the east line of the Brooks tract as the west boundary, refers to the marked bearing trees of Robinson's tract and marks the southwest corner of the tract conveyed by calling for and describing the bearing trees described in the deed of the 500 acres at the point where a corner of that tract coincides with the southwest corner of the Mary C. Watson land. One of the defendants in error's expert witnesses testified that the land described in the deed from Greene to Garrett (the same description as that contained in the deed from Huffhines to Greene) when run on the ground and as traced on a map prepared by him, is the same land as what he designates the Mandy Garrett tract, the land in controversy herein. Such ambiguity or uncertainty as may arise from the statement in the deed that the land is within the Davenport survey disappears when the matters of particular description contained in the deed are applied to the ground. On March 2, 1910, F. M. Greene conveyed to Alex Garrett, with reservation of the minerals, the 133 acres of land conveyed by the deed from Huffhines to Greene, using the same description.

It may be true that the testimony of plaintiffs in error's expert witnesses, that they found on the ground at corners believed by them to be corners of the Davenport survey a buried tree, stumps of trees and pine tree holes at courses and distances corresponding with the courses and distances of the bearing trees described in the field notes, would not of itself have constituted evidence of probative value against a construction of the Davenport survey from the northwest corner of the J. H. Rives survey, if the location of that corner were clearly established. But we cannot disregard that testimony as no evidence, when it is considered in connection with the testimony of the same witnesses, showing how they traced on the ground the steps of those who had surveyed, for record owners of the Davenport survey, the 500 acre tract and its subdivisions, the 162 acre tract and the 133 acre tract and who had remarked at corners of the 500 acre tract and its subdivisions what they believed to be corners of the Davenport

survey. Nor can it be said that the acts of the record owners are not to be regarded as evidence on the issue of boundary. Those record owners asserted their ownership of the tracts of land thus surveyed and marked by executing, in 1876, 1880, 1900, 1907 and 1910 the deeds above referred to, describing the land by metes and bounds so as to identify it on the ground as the 133 acre tract here in controversy and the 162 acre tract and 500 acre tract adjoining it and repeatedly referring to the said tracts as being in the Davenport survey. This conduct on the part of many persons, including Huffhines, the county surveyor, who were in position to know the facts, is in our opinion entitled to consideration as substantial evidence tending strongly to prove that the land in controversy is within the Davenport survey. We express no opinion as to the preponderance of the evidence. We have discussed only a part of the evidence contained in the voluminous statement of facts, having endeavored to set out enough of it to show that the boundary question, like that of adverse possession, is one of fact.

What effect is to be given to the deed from F. M. Greene to Alex Garrett, executed March 2, 1910? The description of the land conveyed, as contained in the deed, is the same as that in the deed from Huffhines to Greene, and for the reasons given above in discussing that deed, it is our opinion that the deed from Greene to Garrett describes and is intended to convey the 133 acre tract in controversy. The deed is one of general warranty, executed in consideration of $296.57 paid and secured to be paid by two notes executed by Alex Garrett, payable to Greene, one for $148.28 due November 1, 1910, and the other for $148.29 due November 1, 1911. A vendor's lien is expressly retained to secure the payment of the notes. The deed contains the following reservation: "It is agreed and understood that the pine timber 8 inches in diameter and larger, and that all minerals on and under said land, is reserved in this conveyance and remains the property of the said F. M. Greene. By mineral is meant all oil, gas, coal, lignite, glass, sand, iron ore and all other minerals of every kind and description." The quoted reservation is followed by a paragraph setting out the agreement of the parties that Greene, his heirs and assigns shall have the right to enter upon the premises for the purpose of mining, drilling or operating for oil or gas or other minerals and to erect structure, pipe lines, etc., for the production, transportation and storage of such minerals.

While Alex Garrett did not sign the deed, he was a party to it as grantee, and further became a party to the deed and contract by executing the vendor's lien notes given as purchase money. The terms, provisions and obligations of the deed are in our opinion, subject to qualification as hereinafter made on account of the homestead question, binding upon both of the parties to it. The instrument is contractual in nature, representing and setting forth the agreement of the grantor and the grantee as to what the interests, rights and obligations of said parties shall thereafter be with respect to the land. It was executed in settlement of conflicting claims of the parties. Garrett was in possession of the land, claiming to have acquired a right or title to it by possession. The right or title claimed by him was not evidenced, however, by any formal or final determination of the sufficiency of his possession to give him a limitation title. The evidence in the record as to his possession up to that time is such that the question of its sufficiency was a question of fact, subject to determination either for or against him by a court or jury. Greene's claim of title to the land was also at that time subject to dispute and to the hazard of a decision of the facts against him. He had record title to the land through the deed from Huffhines, if the land was within the bounds of the Davenport survey, but the evidence does not conclusively show that it was so located. In this situation, the deed was executed, setting out the agreement of the parties that Garrett should pay to Greene a stated sum evidenced by notes, that thereafter the title to the surface should be in Garrett and the title to the minerals and merchantable timber in Greene, the latter warranting to defend the premises unto Garrett against all claims.

2, 3 The general rule is that the grantee in a deed accepted by him is a party to the deed, even though he does not sign it, and that he is concluded by recitals in the deed and by reservations contained therein in favor of the grantor. Martin v. Roberts, 57 Texas 564, 568; Orbeck v. Alfei, 276 S. W. 947; 21 Corpus Juris, p. 1095, Sec. 81; 19 Am. Jur., p. 627, Sec. 29, p. 624, Sec. 26. "The obligations undertaken by the parties to a deed are binding contractually; and where the conveyance is by way of deed poll—that is, one executed by the grantor alone—obligations are enforceable against the grantee by virtue of his acceptance of the deed." 16 Am. Jur., p. 645, Sec. 358. The recitals in the deed that the vendor's lien is retained to secure payment of notes executed by Garrett are contractual. Pridgen v. Furnish, (Com. App.) 23 S. W. (2d) 307. The

recitals which give the suface estate to Garrett and reserve the mineral estate to Greene are likewise contractual. They define the character and extent of the ownership and interests of the parties in the land affected by the deed. Kahn v. Kahn, 94 Texas 114, 58 S. W. 825.

It is held that the recital of one deed in another binds the parties to the deed containing the recital, and those who claim under them, and may take the place of a deed and thus form a muniment of title. Hardy v. De Leon, 5 Texas 211, 244; Harvard v. Smith, 13 S. W. (2d) 743; Simonds v. Stanolind Oil & Gas Company, 134 Texas 332, 345, 114 S. W. (2d) 226, 136 S. W. (2d) 207.

Chief Justice Shaw, writing an early decision of the Supreme Court of Massachusetts, expressed the opinion that "by apt words, even in a deed poll, a grantor may acquire some right in the estate of the grantee." In seeking to classify a right so acquired he said: "It is not, however, strictly by way of reservation, but by way of condition or implied covenant, even though the term 'reserving' or 'reservation' is used. * * * We think it would enure by way of implied grant or covenant, and not strictly as a reservation. It results from the plain terms of the contract." Dyer v. Sanford, 50 Mass. (9 Metcalf) 395, 405, 43 Am. Dec. 399. In our opinion the classification of such right, whether as a condition, implied grant, implied covenant or reservation is unimportant. We believe it sufficient to say that the right or interest arises out of or is created by a deed contractual in its nature and that the grantee is bound by the contract in the form of a deed because he is a party to it.

The argument is made that the deed from Greene to Garrett neither conveyed the surface to Garrett nor reserved the minerals to Greene, because Greene had no title either to the land or to the minerals, the title being in Garrett by virtue of adverse possession and the land not being in the Davenport survey. The argument assumes as established facts what the record shows were matters undetermined and disputed. Furthermore, the question presented is not whether Greene had good title and conveyed good title to the surface to Garrett and reserved or excepted to himself good title to the minerals. It is: Are the parties to the deed and those claiming under them bound, as between themselves, by the recitals and provisions of the deed?

In Waco Bridge Company v. City of Waco, 85 Texas 320, 20 S. W. 137, the bridge company, alleging its ownership of

two acres of land by purchase and deed from W. B. and S. B. Trice, sought to enjoin the city from constructing and maintaining a storm sewer across the land. On the trial the bridge company offered in evidence its deed from the Trices and also other deeds which seemed to convey to it part of the land or an interest in it. There was no proof of title in the Trices excepting a deed offered by the city and admitted over the bridge company's objection, by which D. C. and J. D. Giddings, by attorneys, conveyed the land to W. B. and S. B. Trice. That deed reserved streets across the land conveyed and dedicated them to the public use. The court's opinion states that "The most important question in the case is, whether or not the bridge company is so related to the deed made by J. D. and D. C. Giddings, by their attorneys in fact, to the Trices, as to bind it by the reservation contained in that deed, and whether the deed was properly admitted as evidence against it to prove the reservation." The court's decision answered in the affirmative both parts of the question thus stated. In so holding the court said:

"The deed clearly reserved and dedicated a street, as was contended by the city. *If the plaintiff had accepted it and held held under it, or if it was a link in its chain of title, it was bound by it. Even if it was not a necessary link in its chain of title, if it acquired the title of those holding under it for the purpose of quieting its title, or removing clouds or conflicting claims, it must be held to have taken it with and become bound by its reservations.*

"The progress of the trial had developed that the reservation in the deed to plaintiff's vendor established the public street, and was fatal to this branch of its cause. We cannot attach importance to the plaintiff's mere assertion, under such circumstances, that it declined to claim under the deed. Rather than to encounter certain defeat by the reservation in the deed, the plaintiff proposed to risk defeat by the failure of his proof of title when the deed was omitted.

"The plaintiff, it seems to us, failed to prove a legal or equitable title to the land, either with or without the introduction of this deed; but the use proposed to be made of it by the defendant, and permitted by the court, did not depend upon its effect in establishing plaintiff's title. *It was sufficient for the purposes of this case if it appeared that it was one of the sources under which the plaintiff claimed the land.* We think

that the evidence abundantly sustains the ruling of the court in that respect." (Our italics.)

The decision that the bridge company was bound by the reservation contained in the deed made to its grantors and the conclusions stated as grounds for the decision in the paragraph above quoted from the opinion support our conclusion as to the effect that should be given under the facts of the instant case to the reservation contained in the deed from Greene to Garrett.

Scarbrough sued Poitevent, in Poitevent v. Scarbrough, 103 Texas 111, 124 S. W. 87, to recover a tract of land containing 109 acres. In 1882 Poitevent made to Scarbrough a deed conveying to him two or more tracts of land, including the land sued for. In 1892 a new deed was made by Poitevent to Scarbrough whereby the same land was conveyed, except that the land sued for was omitted from the second deed. The new deed recited that the consideration for the conveyance was the payment of the purchase money notes mentioned in the first deed, that the land conveyed were the same lands as those conveyed by the first deed and that the new deed was executed to give a more full and complete description of the said land. The plaintiff Scarbrough claimed that he was entitled to all of the land embraced in both deeds, while the defendant Poitevent took the position that the second deed was accepted in lieu of the first. The Supreme Court reversed the trial court's judgment for the plaintiff Scarborough and held that the jury should have been instructed to return a verdict for the defendant Poitevent. The gist of the decision is stated in the opinion as follows: "Looking to the terms of the deed and the recitals in it, it is very clear that the second deed was substituted for the first, and by its very terms it is stated that the land described therein was the very land conveyed in the first. The plaintiff is estopped by the terms of the second deed from claiming any of the land which is not embraced therein."

Thus the plaintiff, the grantee, was held bound by the terms and provisions of the second deed, the effect of the decision being to invest the grantor with title to the 109 acres of land that had been conveyed to the grantee by the first deed and omitted from the second deed, although the grantee did not execute either deed or any deed.

In Bumpass v. Bond, 131 Texas 266, 114 S. W. (2d) 1172,

no issue of fact being raised, the court construed a deed from Bonds to Bumpass and a note given by Bumpass for the purchase money. At the time when the deed was executed Bond owned a 2/11th interest and Bumpass a 9/11th interest in the tracts of land. The deed, however, described the land by metes and bounds without any restriction limiting the interest conveyed to less than the entire interest and expressly retained a vendor's lien upon the land conveyed. The warranty was limited to the 2/11th undivided interest owned by the grantor. The holding made by the court, that the deed gave Bond a lien on the entire interest, although Bumpass did not execute the deed and although Bond's deed could in fact convey title to no more than the 2/11th interest that he owed, rests upon a construction of the deed and note as representing by their terms a contract between the grantor and the grantee that the lien should extend to the entire interest in the land. Similarly, in the instant case the deed from Greene to Garrett and the notes given by Garrett for the purchase money represented a contract between Greene and Garrett that the surface estate in the land should be held and enjoyed by Garrett and the mineral estate by Greene.

It follows from the decision last discussed and the other authorities above cited that, since the parties to the Greene-Garrett deed are bound by the terms of their contract, it was not necessary, in order to make the reservation in the deed effective in favor of Greene and those holding under him and against Garrett and those holding under him, that good title to the land be shown in Greene at the time when the deed was executed. The deed, as between the parties to it, having worked a severance of the mineral estate from the surface estate, such possession of the surface as was exercised by Garrett, and those claiming under him, after the execution of the deed was not adverse possession of the minerals. Elliott v. Nelson, 113 Texas 62, 251 S. W. 501; Rio Bravo Oil Company v. McEntire, 128 Texas 124, 136, 95 S. W. (2d) 381, 96 S. W. (2d) 1110; Luse v. Boatman, 217 S. W. 1096 (application for writ of error refused).

The ruling that the reservation of the minerals is binding and effective as between Greene and Garrett and those in privity with them is not in conflict with Thomas v. Southwestern Settlement & Development Company, 132 Texas 413, 123 S. W. 290. In that case appellants Thomas et al were the owners of an undivided 3/35th interest in the land and the

Houston Oil Company of Texas was the owner of an undivided 32/35th. The oil company executed a deed which purported to convey to the Southwestern Settlement & Development Company the entire interest in the land and which reserved to the grantor all oil and gas. The appellants and those under whom they claimed, the owners of the undivided 3/35th interest, were in no way parties to the deed. It was held that "As against appellants, the deed did not convey their interest in the surface estate to Southwestern Settlement & Development Company and did not except or reserve their interest in the oil and gas to Houston Oil Company of Texas, and therefore the deed neither worked a severance of appellants' mineral estate from appellants' surface estate nor segregated appellants' interest in the oil and gas from the surface estate." There is no intimation in the opinion that as between Houston Oil Company of Texas and Southwestern Settlement & Development Company, the parties to the deed, the reservation of all of the oil and gas was not fully effective.

It follows from what has been said that if Alex and Mandy Garrett had not on March 2, 1910, perfected title to the land in controversy by adverse possession, the Greene-Garrett deed executed on that date and the reservation of the minerals were effective and binding on Alex Garrett and Mandy Garrett and those claiming under them. This is true even though Garrett and wife were on that date living on the land and claiming it as homestead, for they could have no homestead right or interest in land to which they had no title.

There remains to be considered the question as to the validity and effect of the deed if, at the time of its execution and delivery, Alex and Mandy Garrett had perfected title to the land by adverse possession. The evidence shows that they were at that time living on the land and claiming it as their homestead. It is suggested that if the land was the homestead of Alex and Mandy Garrett the reservation of the minerals contained in the deed was not binding either on Alex Garrett or on Mandy Garrett because the latter was not a party to the deed.

As to Mandy Garrett, the reservation in the deed became binding on her because she made the deed her deed by ratification. The deed from Greene to Garrett was delivered to Garrett prior to his death in 1912. The records of the county clerk's office contain an entry showing that the deed was filed

for record by Alex Garrett September 26, 1916. Alex Garrett or Mandy Garrett exhibited the deed to persons who were interest in leasing the land for oil. Such persons examined the deed and declined to take a lease. The land was assessed to Alex Garrett for taxes for the years 1911 and 1912, described as 133 acres in the Davenport survey (the tax records showing payment of the taxes so assessed before they became delinquent. Thereafter the land was assessed to Mandy Garrett, later to Mandy Garrett and Jesse Baugus, until 1936 and described as 133 acres, later as 103 and 33 acres, in the Davenport survey, and the taxes so assessed were paid for most of the years to about the year 1933. We find no evidence in the record showing that either Alex Garrett or Mandy Garrett or their children repudiated the deed from Greene to the mineral reservation until Mandy Garrett and her children executed oil leases and mineral deeds in the early part of the year 1936, a short time before this suit was filed.

On June 8, 1916, after the death of Alex Garrett, Southern Lumber Company, as first party, and Mandy Garrett, as second party, executed and acknowledged a written agreement, by which the balance due on the two notes executed by Alex Garrett to F. M. Greene as purchase money for the land conveyed by Greene to Garrett and the lien securing the notes were extended. This instrument makes reference to and identifies the deed and the vendor's lien notes and recites that Southern Lumber Company is the owner of the notes and lien by transfer from F. M. Greene, that there is an unpaid balance of $165.80 due on the notes, that Mandy Garrett is the surviving wife of Alex Garrett, deceased, and that the parties to the instrument have agreed to an extension of the time for the payment of the unpaid portion of the indebtedness, "which indebtedness is acknowledged and confessed to be just by the party of the second part," so that the debt shall mature October 15, 1916.

Mandy Garrett, on September 30, 1916, executed and acknowledged a warranty deed conveying 60 acres off the north side of the 133 acre tract to her son-in-law, Jesse Baugus and her son, Harvey Garrett, the deed containing the same description of the whole tract by metes and bounds as that in the deed from Greene to Garrett and providing that the dividing line should thereafter be run so as to separate the 60 acres from the balance of the 133 acres. The consideration set out in the deed is the assumtpion by the grantee of the unpaid

vendor's lien note described in the deed from Greene to Alex Garrett, that deed being referred to by the book and page of the deed records where it is recorded. Jesse Baugus filed the deed for record on January 28, 1924. He caused the dividing line between the 60 acres conveyed to him and the remainder of the tract to be run by a surveyor sometime in 1916, and he and Mandy Garrett, the other grantee, paid the purchase money for the 60 acres that they had agreed to pay. Baugus built a house on the north 60 acres and he and his wife were living in it at the time of the trial.

By the formal execuiton of the extension agreement and the deed to Baugus and Harvey Garrett, containing the recitals above described, Mandy Garrett ratified the deed from Greene to Garrett and made it her own as fully as if she had been a party to its execution and became bound by the terms and provisions of the deed, including the reservation of the minerals. Grissom v. Anderson, 125 Texas 26, 33, 79 S. W. (2d) 619; Humble Oil & Refining Company v. Clark, 126 Texas 262, 87 S. W. (2d) 471.

We are further of the opinion that Harvey Garrett and Jesse Baugus and his wife, Fannie Baugus, by accepting the deed from Mandy Garrett conveying 60 acres of the 133 acre tract to Jesse Baugus and Harvey Garrett and by claiming and possessing the land under that deed, as shown by the undisputed evidence, ratified the deed from Greene to Garrett and became bound by the terms and provisions of that deed, including the reservation of the minerals.

As to so much of Alex Garrett's interest as vested at his death in his heirs, other than Harvey Garrett and Fannie Baugus, the question presented for decision is whether the Greene-Garrett deed had, or should be given, the effect, either on the execution of the deed or thereafter, of divesting Alex Garrett and his heirs of their interest in the minerals. On this question, the writer has conferred with the Supreme Court, and it directs the holding set out in the succeeding paragraphs.

4 The Court's opinion is that if at the time the Greene-Garrett deed was executed Alex and Mandy Garrett had acquired title to the land by limitation, the deed was not effective to convey anything, and that, in so far as Alex Garrett's interest in the land was concerned, the Greene-Garrett deed did not

have the effect of reserving the minerals to Greene either at the time of its execution or upon its ratification by Mandy Garrett.

Under the record in this case, if, at the time Greene executed his deed to Alex Garrett, Alex and Mandy Garrett held title to this land by limitation, such deed was ineffective to convey anything. Also such deed could not operate to create a vendor's lien on this land, or to reserve any kind of title to any timber estate thereon or to any mineral estate therein. If the land was the homestead of Alex and Mandy Garrett, they could only give a lien thereon for purchase money, taxes thereon, and work and material used in constructing improvements thereon. Texas Constitution, Article 16, Section 50; Article 3839, Revised Civil Statutes 1925. Also, if at the time of the above transaction with Greene, this land was the property and homestead of Alex and Mandy Garrett, it could not be sold except "by the joint conveyance of both Alex and Mandy Garrett." Article 16, Section 50, Texas Constitution; Article 4618, Revised Civil Statutes 1925; see Article 6605 and 6608, Revised Civil Statutes 1925, with reference to acknowledgments of married women. It follows from the above that, if this land belonged to Alex and Mandy Garrett at the time of Alex Garrett's transaction with Greene, such transaction did not, and could not operate to vest Greene with either a vendor's lien on this land or title to the timber and mineral estates attempted to be reserved by him. Peaslee v. Walker, 34 Tex. Civ. App., 297, 78 S. W. 980, (writ refused).

In the Peaslee case, supra, Hanrick and Goodrich sued John Walker and his wife, Martha Walker, for title to and possession of a tract of land in Williamson County, consisting of something less than 160 acres. If the land belonged to Walker, it was their homestead. Hanrick and Goodrich, on the one side, and John Walker, on the other, attempted to compromise their differences out of court. Hanrick and Goodrich executed to John Walker a deed to the land in controversy, and John Walker executed and delivered to Hanrick and Goodrich two vendor's lien notes. H. Peaslee became the owner of these notes, and, on John Walker's default, brought suit against John Walker to recover on the notes and foreclose the vendor's lien on the land. Walker answered by general denial, and specifically pleaded that Hanrick and Goodrich had no title to the land which they had conveyed to him. Walker also pleaded that the land was the homestead of him-

self and his wife at the time of the transaction in suit. Martha Walker intervened, and set up the same defenses as her husband. It was shown at the trial that Hanrick and Goodrich had no title whatever to the land at the time they conveyed to John Walker and accepted his purported vendor's lien notes. Also it was shown that the Walkers actually owned the land, and that it was their homestead. Under such a record, it was held that the transaction between Hanrick and Goodrich, on the one side, and John Walker, on the other, was ineffective to create a lien against the Walker homestead. In effect, it was held that if Walker held the title to the land and it was his homestead, he could not create a lien thereon by compromising with an adverse claimant who held no title. We quote the following from the opinion:

"5. The Constitution, in article 16, Sec. 50, provides that no mortgage, trust deed, or other lien on the homestead shall ever be valid, except for the purchase money therefor or improvements made thereon, whether such mortgage or trust deed or other lien shall have been executed by the husband alone, or together with his wife, and that all pretended sales of the homestead involving any condition of defeasance shall be void; and the title of the defendant John Walker and his wife to the 160 acres of land being complete, and the land being their homestead, it was not within the power of the defendant John Walker and E. G. Hanrick and L. W. Goodrich, by a compromise of the suit of Hanrick against the defendant Walker, based on no claim of right to the land, to place a lien on the homestead to secure the payment of the money for which the suit was compromised, in the form of making a deed of conveyance to the defendant, conveying the land, and retaining a lien thereon, or in the form of a mortgage, deed of trust, or otherwise.

"6. The defendant and his wife had perfect title to the land, and were living thereon, at the time the two promissory notes were executed. They made no deed of conveyance conveying the land, nor did they do any other act to mislead any one as to the character of their possession. The two promissory notes were not given for any part of the purchase money of the land, because the title to it was already complete, and the vendors, E. G. Hanrick and W. L. Goodrich, had no claim whatever to the land. The transaction amounted to nothing more than an attempt on the part of John Walker to create a lien on the homestead to secure the payment of a debt which he incurred in compromise of the suit, and the fact that

the plaintiff purchased the two promissory notes for value, and before the maturity of either one of them, does not place him in any better position than he would have been if they had been secured by mortgage or deed of trust on the homestead."

It appears that Alex Garrett died in 1912. At the time of his death, Alex and Mandy Garrett were still living on this land, and, if they owned it, it was their homestead. Nothing had transpired between Greene and those holding under him and Alex Garrett concerning this land. Mandy Garrett never had any transaction with Greene or those holding under him prior to Alex Garrett's death. It follows that if, at the time of Alex Garrett's death, this land belonged to the community estate of Alex and Mandy Garrett, Alex Garrett's one-half interest descended and vested immediately in his heirs at law. Mandy Garrett continued to own the other one-half in her own right as community survivor. At the very moment of Alex Garrett's death this land became the joint property of Alex Garrett's heirs and his surviving wife, one-half to the heirs and one-half to Mandy Garrett. Finally, it follows that since Greene and those holding under him had no claim on this land during the lifetime of Alex Garrett, the heirs of Alex Garrett took title as such heirs, with the same rights in the land that Alex Garrett had prior to his death. Of course, the one-half interest in the land which descended to Alex Garrett's heirs was burdened with the right of Mandy Garrett to use and occupy same as a homestead for her natural life.

We think that Mandy Garrett, by the execution of the instruments, which have been described in the opinion, at a time when she was a feme sole and had a right to waive her homestead claims on this land, ratified and confirmed the transaction between her deceased husband and Greene. The Court's opinion is, however, that such ratification could not effect the rights of Alex Garrett's heirs which had vested at the moment of Alex Garrett's death. At that time Alex Garrett had never parted with his title in this land, or any part thereof, and neither had Mandy Garrett. Alex Garrett's contract never bound either himself or his wife. When Mandy Garrett ratified Alex Garrett's attempted contract after his death, she parted with her interest in the mineral estate in the land as of date of her contract. Humble Oil & Refining Co. v. Clark, 126 Texas 262, 87 S. W. (2d) 471. Simply stated, Mandy Garrett's contract operated to write therein as a part thereof Alex Garrett's contract; and her contract, taken as a

whole, considering Alex Garrett's contract as a part thereof, in law, operated to divest her of title to the mineral estate in this land by virtue of her own contract and of date thereof. Her contract never gave any life to Alex Garrett's contract as such, but only operated to make it a part of her contract. It follows that her contract did not convey or affect the interest that vested in Alex Garrett's heirs upon his death.

The judgments of the Court of Civil Appeals and the district court are reversed and the cause is remanded to the district court for trial in accordance with this opinion.

Opinion adopted by the Supreme Court February 26, 1941.

### ON REHEARING.

After careful consideration of the three motions for rehearing filed herein, being Motions Nos. 14914, 14915 and 14919, the Court adheres to the rulings made in its opinion filed herein February 26, 1941, and hereby overrules the said motions.

All of the defendants in error, except Fannie Bauguss and her husband, Jesse Bauguss, and Paul W. Torrans, have filed a motion, being motion numbered 15131, in which they state that because of the Court's construction of the law applicable to this controversy they would probably be unable in another trial in the district court to discharge the burden of proof placed upon them, and in which they pray that in the event the Court overrules the motions for rehearing filed by defendants in error, it reverse and render the whole case in favor of plaintiffs in error and against defendants in error, meaning that the judgment of the Court of Civil Appeals be reversed and the judgment of the district court affirmed. The said motion is granted to the extent hereinafter indicated.

5 In the opinion filed herein it was held that defendants in error, Fannie Bauguss and Jesse Bauguss, as well as defendant in error Harvey Garrett, by accepting the deed from Mandy Garrett dated September 30, 1916, conveying sixty acres of the tract of land in controversy herein and by claiming and possessing the land under that deed, ratified the deed from Greene to Alex Garrett dated March 2, 1910, and became bound by the terms and provisions of that deed, including the reservation of the minerals. That ruling extended to all of the interest in the land in controversy owned by Fannie Bauguss, Jesse

Bauguss and Harvey Garrett at the time of the execution and delivery of the said deed from Mandy Garrett dated September 30, 1916, but it did not extend to the interest which Fannie Bauguss may have acquired thereafter by inheritance from her brother, Fred Garrett.

The judgment heretofore rendered herein reversing the judgments of the Court of Civil Appeals and the distict court and remanding the cause to the district court is set aside; and the judgment of the Court of Civil Appeals is reversed, and the judgment of the district court is affirmed as to all parties and as to all interests in the land in controversy herein, except that the cause is remanded to the district court for trial, in accordance with the opinion herein, of the matters in controversy between plaintiffs in error and defendants in error Fannie Bauguss, Jesse Bauguss and Paul W. Torrans only in so far as they relate to the interest that may have been inherited by Fannie Bauguss from her brother, Fred Garrett.

Opinion adopted by the Supreme Court July 23, 1941.