**SCHNEIDER v. MURPHY et al.**

No. 12951.

United States Court of Appeals
Fifth Circuit.

Aug. 5, 1950.

Rehearing Denied Sept. 20, 1950.

Clayton Heare, Wm. Q. Boyce, Amarillo, Tex., Armwell L. Cooper, Ellison A. Neel, and Wallace Sutherland, Kansas City, Mo., for appellant.

R. A. Stone, Amarillo, Tex., Roy W. Crimm, Oscar D. McCollum, Kansas City, Mo., for appellees.

Before HUTCHESON, Chief Judge, and McCORD and RUSSELL, Circuit Judges.

RUSSELL, Circuit Judge.

In this suit, predicated upon diversity of citizenship and the requisite amount in controversy, the plaintiffs, appellees here, asserted the equitable ownership of designated interests in a large acreage of land in Ochiltree County, Texas, to which the defendant claimed and asserted full and complete title. The plaintiffs and the defendant are members of the John Kelley family, originally of Kansas City, Missouri, or claimants by conveyance and inheritance from members of that family. In substance the plaintiffs' claims involve the legal validity and effect of four written conveyances, when they are considered to the extent legally proper in the light of the surrounding circumstances and conduct of the parties involved. While there are other interests involved by descent, in the interest of clarity we shall relate the facts as the interests were originally represented in the wife and widow, and sons and daughters of the original grantor. The family of John Kelley consisted of his wife Mary Ann Kelley, his sons, Arthur B. Kelley and John M. Kelley, and his daughters, May Kelley Schneider and Harriett Ruth Kelley. May Kelley Schneider is the present defendant-appellant, and representatives and heirs of John M. Kelley and Arthur B. Kelley are the plaintiff-appellees.

The conveyances involved are as follows: On May 11, 1918, John Kelley delivered to his son, Arthur B. Kelley, two general warranty deeds, conveying to him, among other lands located in Kansas and Missouri, the land involved in this action. These deeds were all properly recorded. On the same day, Arthur B. Kelley duly executed an instrument set forth in the footnote.[1] This instrument was not recorded until April 20, 1946, after the death of Arthur B. Kelley, which occurred in 1943. Upon the trial it appeared from the testimony that it was not discovered until shortly before its record, and that it was found among the files of Charles M. Bush, the attorney for John Kelley, to whom it had been delivered after its execution, but who had been dead for a number of years. By general warranty deed, acknowledged March 27, 1937, Arthur B. Kelley conveyed to Charles H. Henderson, an employee, the land involved in this action, and on the same day Henderson acknowledged the execution of an instrument conveying the identical lands to Arthur B. Kelley and May Kelley Schneider, with granting, and habendum, clauses as set forth in the footnote.[2] These deeds were

1. "I hereby acknowledge that I hold the title to all of the real estate this day conveyed to me by my father, John Kelley, in trust, as follows:

"The Home place, Lot Five (5) Vienna Place, in Kansas City, Jackson County, Missouri, in trust for my mother, Mary Ann Kelley, who shall be the sole owner thereof.

"All of the balance of said property conveyed to me as aforesaid, same being located in Wyandotte, Leavenworth and Sedgwick Counties, Kansas, Ochiltree County, Texas, and Jackson County, Missouri, is held by me in trust as follows:

"An undivided one-half interest for my mother, Mary Ann Kelley; an undivided one-sixth (1/6) interest for my brother, John M. Kelley; an undivided one-sixth (1/6) interest for my sister, May Kelley Schneider, and the remaining one-sixth (1/6) interest belonging to myself absolutely."

2. "* * * have granted, sold and conveyed and by these presents do grant, sell and convey unto the said Arthur B. Kelley of the County of Jackson and State of Missouri, and May Kelley Schneider of Alameda County, California, for the period of their joint lives with the remainder to the survivor, his or her heirs, successors and assigns, * * *."

"To Have And to Hold the above described premises, together with all and singular the rights and appurtenances thereunto in anywise belonging, unto the said Arthur B. Kelley and May Kelley

duly recorded in Ochiltree County, Texas. Prior thereto, and on August 1, 1919, John M. Kelley in consideration of "One Dollar and other Valuable considerations" (which was shown to be money which Arthur B. Kelley had furnished John M. Kelley at a time when he was in financial straits), released and quit-claimed unto Arthur B. Kelley "All of my right, title and interest in and to any and all property conveyed to the said Arthur B. Kelley by my father, John Kelley. This shall constitute a full release of all my interest in any property so conveyed outside of Jackson County, Missouri, also." At all times from the date of the first conveyance by the father in 1918, until the time of Arthur's death in 1943, Arthur B. Kelley managed the property now in controversy, and it appears from the statements in the record that a deficit of $42,684.71 was incurred in the operation up to 1935. The record does not disclose the state of affairs subsequent to that time with any definite certainty. The mother, Mary Ann Kelley, died on June 28, 1928. Upon the death of the mother, John M. Kelley, Arthur B. Kelley, and May Kelley Schneider, each inherited under her will an undivided one-fourth of her one-half interest. Another daughter, Harriett Ruth Kelley (who was not a beneficiary under the trust declaration), inherited under the will of the mother an undivided one-fourth of the mother's one-half interest. Upon the death of this sister on June 20, 1930, John M. Kelley, Arthur B. Kelley, and May Kelley Schneider, each inherited one-third of her one-eighth interest.

John M. Kelley inherited from his mother and his sister, Harriett Ruth Kelley, an equitable interest in the land, the two interests amounting to an undivided one-sixth equitable interest in the property. Thus, the legal title to said lands was in Arthur B. Kelley, subject to this one-

sixth beneficial interest in John M. Kelley, and a two-sixths beneficial interest in May Kelley Schneider which she held under the original trust declaration and the wills of her mother and sister, Arthur B. Kelley at that time owning an undivided one-half beneficial interest therein. After the execution of what we will designate the Henderson deeds referred to above, Arthur B. Kelley, after a long engagement, married Miriam Horne, who by the terms of his will was devised fifty percent of his residuary estate, other devisees being May Kelley Schneider and John M. Kelley, each devised eighteen percent; four percent to each of three nieces and nephews, and one percent to another nephew. The estate conveyed in accordance with the will was substantial, the fifty percent interest of the widow being inventoried at some two hundred thousand dollars.

The appellees represent two sets of claimants. One, those claiming under the will of Arthur B. Kelley, and secondly, those claiming through John. The contention of the will claimants is that the Henderson deed transaction, referred to above, was intended to be, and in law was, merely the means by which Arthur attempted to name a successor trustee or co-trustee to succeed to the management of the properties in the event of his death, disability or incapacity to act. They contend that the instrument executed by Arthur B. Kelley in 1918 acknowledged the creation of an entire, indivisible trust estate. Those claiming under the son and brother, John M. Kelley, in addition to the claim as beneficiaries under Arthur B. Kelley's will, assert the additional claim that the undivided one-sixth interest in the land which John M. Kelley acquired as devisee under the wills of his mother and sister, being after acquired property, did not pass by the quitclaim deed from John M. Kelley to Arthur B. Kelley.

Schneider for the period of their joint lives with the remainder to the survivor, his or her heirs, successors and assigns, forever. And, I do hereby bind myself, my heirs, executors and administrators, to warrant and forever defend, all and singular, the said premises

unto the said Arthur B. Kelley and May Kelley Schneider for the period of their joint lives with the remainder to the survivor, his or her heirs, successors and assigns, against every person whomsoever lawfully or to claim the same or any part thereof."

It is conceded by the appellant that this inherited one-sixth interest of John M. Kelley was not conveyed by the quitclaim deed and was not covered by the Henderson deeds, and that these claimants are entitled to receive such interest. It is asserted, however, that both Arthur B. Kelley and May Kelley Schneider had a mistaken idea as to the effect of the quitclaim deed and thought it covered after acquired property. This is based upon statements in a letter dated June 24, 1936 from Arthur B. Kelley to May Kelley Schneider declaring "Brother John * * * released his share to me in consideration of money I had loaned to him and his quitclaim deed paper is among the mill files."

■ Under the concession, and the law, this inherited one-sixth interest of John M. Kelley rightfully belongs to these claimants, as found by the trial Court.

The remaining issue in the case concerns the legal effect of the Henderson transaction. As to this, the trial Court by findings of fact and conclusions of law sustained the contentions of the plaintiffs.

The Court's material and controlling findings are attacked as clearly erroneous, and the consequent conclusions of law are likewise attacked, and in substance the appellant contends that for various assigned reasons a finding in her favor was required as a matter of law. The appellees, in reply, point to testimony which they contend authorized the findings entered by the Court, and vigorously argue in support of the legal correctness of the Court's conclusions.

We shall not attempt to detail the voluminous evidence in the case, much of it given by depositions and interrogatories. We have already indicated some of the factual background of the case. We may add that it is shown that in the case of one sale of some of the property covered by the trust acknowledgment, an equal division was made among the brothers and sisters, even though the sister Harriett was not mentioned in the acknowledgment. Furthermore, no attempt was ever made by any beneficiary to secure a conveyance, and as has been seen, there were no uses expressly declared in the trust acknowledgment. Arthur B. Kelley is freely acknowledged to have been a man of character and integrity, "Who would not wrong or cheat or defraud anyone knowingly." In 1936, he had written May a letter.[3] Upon Arthur B. Kelley's death, May Kelley Schneider immediately claimed full title under the Henderson transaction and took charge of the land involved, operating it through the same agent as had Arthur B. Kelley in his life time. She had conveyed property in Missouri, likewise received from this transaction, and thereupon John M. Kelley and the other claimants first claimed title as now asserted. It was just before the suit presenting this controversy was filed that the trust acknowledgement was discovered and recorded. These claimants were unsuccessful in that litigation. That adjudication, while not between the same parties, is now plead by the appellant as *res adjudicata* on the ground that she as grantor had in effect maintained the litigation conducted by her grantee. As directly involving the Henderson transaction, the plaintiffs here introduced testimony that Arthur B. Kelley, both before and after the date of the execution of these deeds, referred to the lands as "the family holdings" and as "the Kelley lands," and that prior to the time the deeds were executed he told Henderson that he "desired all of the real estate held in his name to be transferred to himself and May Kelley Schneider, his sister," whereupon the witness

3. "Dear May:
  "Enclosed you will find statement regarding Texas and Kansas lands. All of that property is in my name, deeded to me by mother and father before father went to the hospital in 1918. Brother John, while in financial trouble, released his share to me in consideration of money I had loaned to him and his quit claim deed paper is among the mill files. Could you send me the form of deed used in California, whereby the property is in the name of two or more people and transfers itself. I don't know whether such deeds are acceptable in Kansas and Texas. All well here. Hope all well there."

Timmons made arrangements with a law firm to handle the matter. He also testified that Arthur B. Kelley after the Henderson transaction stated to him that John still had an interest in the property; that at that time they were contemplating the sale of other land and Arthur stated that in case of sale John M. Kelley would receive his share of it, and that the sale was not made because Arthur did not want to make a sale of it for the reason that John would get his share "and he, (Arthur) said he would go through with it." Further that in the fall of 1936 or in 1937 Arthur told him that "he thought it would be a good idea" to put another trustee in the deed; and after the deeds were made Arthur stated that "he wished he had not done so," explaining as his reason that he was afraid his sister could not properly manage the property. Testimony of his complaints of the failure of the others to pay their share of the taxes, and testimony from other witnesses, relatives of Arthur's widow, with relation to statements by Arthur to his wife to the effect that if the property was sold it had to be divided and John M. Kelley would get his share, was also presented.

The defendant, testifying in explanation of the Henderson transaction, in addition to reliance upon the letter from Arthur above set forth, testified to the effect that she and Arthur had had conversations with reference to the matter and that "There were several discussions between Arthur B. Kelley and myself about the conveyances of the Kansas and Texas lands from Arthur to Charles H. Henderson and from Charles H. Henderson to Arthur and myself. These discussions were several days before the date the deeds were signed, which date was on March 27, 1937. Arthur talked with me about having the property conveyed in that way several times before he talked with Charles H. Henderson. Then one day in my presence he told Bert (Charles H. Henderson) the way he wanted the deeds prepared. The deeds which were signed on March 27, 1937 were prepared the way Arthur told Bert to have them prepared. The discussions took place between Arthur and myself, except for Arthur's direction to Bert as to how the deeds were to be drawn. In these discussions my brother Arthur told me that he wanted to convey the property to Bert and to have Bert convey the property to me and himself (Arthur). Trusteeship was not mentioned. Arthur told me that he wanted to fix it so that when one of us died the one who was still living would own the property. He told me that he had written to me about deeds of that kind a few months before. He told me that if he conveyed the property to Bert and then Bert conveyed it to him (Arthur) and myself, with the right words, if he died first I would own all of the property, and if I died first he would own all the property. He asked me if that was agreeable to me, and I told him it was. I do not remember the exact dates that these conversations took place, except that they took place there at the hospital before the day the deeds were signed. I was there at the hospital a great deal with Arthur. I was there in the room when the deeds were signed."

The substance of the findings of the Court, which were full and complete, are summarized, as to controlling features: that the acknowledgement of trust created "a single active trust in which Arthur B. Kelley was trustee with power of sale, and the entire equitable title in said land was subject to such trust;" that Arthur B. Kelley knew and recognized John's ownership of an undivided interest in the equitable title to the land by virtue of his inheritance, and likewise as to May by virtue of the acknowledgement of trust and her inheritance; and that May knew the lands in controversy were trust properties. He found that there was no consideration for either the deeds from Arthur to Henderson, nor from May and Arthur to Henderson, nor from May to Arthur, nor for any of the Henderson deeds, and that Arthur had no intention of making a gift of any equitable title in the property. Further, that neither Arthur nor May, by the Henderson transaction, conveyed his or her undivided equitable title to the land to anyone, and never entered into any enforceable contract to do so, nor had either of them relinquished or abandoned such interest to anyone. The Court accordingly entered conclusions of law in accordance with his findings of fact,

by which it was adjudged that there was no merger of the equitable and legal title of Arthur B. Kelley; that the deed from Arthur B. Kelley to Henderson passed no equitable title; and that the Henderson deeds vested legal title only in Arthur B. Kelley and May Kelley Schneider as joint tenants with the right of survivorship, "and they were trustees for the owners of the equitable title as tenants in common," and such latter title in the equitable ownership of the land never merged with the legal title as joint tenants with the right of survivorship. The Court accordingly adjudged the respective interests of the plaintiff-claimants in the land and prorated division of the cash deposited by Mrs. Schneider as the proceeds from the land.

'Counsel for both appellant and appellees have argued their respective contentions at length, and present discussions and authorities dealing with every question which in any way appears to be involved in the case. While the discussions and authorities are interesting (and are not improper to be presented because counsel can not know which, if any, of their points will be accepted by the Court), in the view we have of the case, some of the points discussed range far afield, and others we find unnecessary to pass upon. In this connection, we observe that some of the controlling findings of fact of the Court are in actuality conclusions of law, and since we find these erroneous, there is in reality no occasion for determining whether as facts only, these findings are clearly erroneous.

■ We have gone at length into the facts and circumstances of the case. There is no necessity for any extended discussion of the law, and we therefore only briefly advert to the reasons which have led us to the conclusion that the legal effect of the Court's findings and conclusions is erroneous and may not stand. In the last analysis, the construction of the legal instruments is a matter of law, and as to this we of course must ourselves pass judgment.

■ The acknowledgement of trust does not evidence a single, active trust. As to any beneficiary, his or her trust could have been executed and discharged by a mere conveyance of the legal title to such interest. As to the property in controversy, there were separate trusts and separate beneficiaries. The holding of the trial Court to the contrary is the controlling vice in his determination of the cause. We construe the trust instrument to reserve to Arthur B. Kelley full and absolute title to his one-sixth interest in the property referred to. He was not a trustee for himself.

■■ As to the Henderson transaction, no question of merger is involved, and Arthur B. Kelley conveyed to Henderson, as the conduit for reconveyance to him and his sister, all of the interests he had, both legal and equitable, since the instrument by neither written expression nor legal construction evidenced any reservation of his equitable interest.[4] There is no room here for any application of the rule of abandonment or relinquishment of written title. May Kelley Schneider by the acceptance of the Henderson deed as a part of a contemporaneous transaction,[5] became bound by its terms.[6] The very nature of the transaction by which Arthur B. Kelley and May Kelley Schneider conveyed their respective full interests in the property to the other subject to the contractual terms expressed in the Henderson transaction, in law furnished a consideration for the instruments, even though the respective extent of benefit or detriment to· them could not be determined until the occurrence of the event of survivorship. The acceptance of this deed being in legal effect the same as an execution thereof, it likewise, as to May Kelley Schneider, evidenced a disposition of her equitable estate made, and to be made in the future, in accordance with the terms

4. Compare Art. 1290, Revised Civil Statutes of Texas, 1925; 14 Tex.Jur. 930, § 151; Busha v. Fortson, 5 Cir., 116 F.2d 325, 328; Standefer v. Miller, Tex.Civ. App., 182 S.W. 1149.

5. 16 Am.Jur. 537, § 175.

6. Greene v. White, 137 Tex. 361, 153 S. W.2d 575, 136 A.L.R. 626.

of the instrument. The form of the transaction effected as to Arthur B. Kelley and May Kelley Schneider a termination of the trust as to them, the parties to the transaction. At that time they, neither under any legal disability, were the only persons concerned with the legal and equitable interests, except for John Kelley's equitable interest. It is true that, regardless of intention, or whatever ground may have existed for a bona fide belief to the contrary, the Henderson transaction did not in terms, and could not in equity, deal with the one-sixth interest which John M. Kelley owned by inheritance from his mother and sister. This, however, whether a wrong done by design or by inadvertence, did not destroy the effect of the conveyance as to the parties thereto. Arthur B. Kelley, if living, could not take advantage of this fact to escape the legal effect of his conveyance. His devisees, standing in his stead, are likewise foreclosed.

■■ As we have observed, the Henderson transaction itself evidences a legal consideration. Therefore, the finding by the Court of no consideration, apparently predicated upon the discrediting of Mrs. Schneider's testimony (which the Court upon sufficient ground could do), is not legally material. The testimony, accepted by the Court, as to Arthur B. Kelley's intention (aside from the fact some of it arose after the conveyance), can not override the expression and legal effect of his written instrument based upon a consideration, so far as he or claimants under him are concerned.[7] There is no charge that Arthur's action was induced by fraud, accident or mistake. We conclude that by the Henderson transaction, and as the result of the earlier demise of Arthur B. Kelley, appellant Mrs. May Kelley Schneider, became vested with the entire five-sixths legal and equitable interests in and to the land in controversy.[8] As we have stated, John M. Kelley was the owner of the remaining one-sixth interest. It follows therefore that the conclusions of the trial Court adjudging that the Henderson transaction evidenced

merely an attempt to secure an additional trustee and to effect no conveyance of the equitable interests of either Arthur B. Kelley or May Kelley Schneider, was erroneous. We have considered, but deem it unnecessary to discuss, any of the other questions presented.

The judgment is reversed and the case remanded with direction to enter judgment declaring appellant the owner of a five-sixths undivided interest in the land in controversy, and with the remaining one-sixth undivided interest to be awarded to the plaintiffs claiming under John M. Kelley.

Judgment reversed and remanded.

---

7. Bumpass v. Bond, 131 Tex. 266, 114 S.W.2d 1172.

8. Compare Shroff v. Deaton, Tex.Civ.App., 220 S.W.2d 489.