Lawrence PEDERSON, Plaintiff and Respondent,

v.

The FEDERAL LAND BANK OF ST. PAUL, a body corporate; and Amerada Petroleum Corporation, a corporation, Defendants and Appellants,

and

Hunt Oil Company, a corporation, Defendant and Respondent.

No. 7524.

Supreme Court of North Dakota.

Sept. 24, 1955.

E. C. Rudolph, Ray, for plaintiff and respondent.

Strutz, Jansonius & Fleck, Bismarck, for defendant and respondent Hunt Oil Co.

Harold J. Fisher, Williston, and John S. Miller, Tulsa, Okl., for Amerada Petroleum Corp., defendant and appellant.

Walter O. Burk, Williston, and Robert J. Barry, St. Paul, Minn., for Federal Land Bank of St. Paul, defendant and appellant.

Michael A. Schmitt, Harold W. Lee, and Stanley F. Casey, St. Paul, Minn., of counsel for Federal Land Bank of St. Paul.

MORRIS, Judge.

This is an action to quiet title to the northeast quarter of section twenty-three, township one hundred fifty-seven, range ninety-five in Williams County brought by the plaintiff Lawrence Pederson whose complaint alleges that he is the absolute owner. The defendant Hunt Oil Company alleges in its answer that the ownership of the plaintiff is subject to an oil and gas lease dated May 25, 1948, from the plaintiff Lawrence Pederson and Thelma Skjelstad Pederson, his wife, to the Hunt Oil Company covering the land in question and recorded in the office of the register of deeds of Williams County on August 25, 1948, in Book 4 of Miscellaneous on page 26, which lease ran for a primary term of ten years and as long thereafter as oil, gas, casing-head gas, casing-head gasoline or any of them is produced. The plaintiff does not question the execution of this lease and as between the plaintiff and the Hunt Oil Company there is no issue. The Hunt Oil Company by its answer also challenges the answers and counterclaims of the defendant Federal Land Bank of St. Paul and the defendant Amerada Petroleum Corporation.

The defendant Federal Land Bank answered and counterclaimed, its contention being that it is the owner of fifty per cent of all the right and title to all oil, gas, and minerals in or under the land in question, together with a surface easement of ingress and egress.

The Amerada Petroleum Corporation filed an answer and counterclaim with respect to the plaintiff and a cross complaint against its codefendant Hunt Oil Company. The Amerada Petroleum Corporation makes substantially the same allegations as does the Federal Land Bank of St. Paul and further alleges that it claims an interest in the property by virtue of an oil and gas lease dated May 3, 1951, executed and delivered to it by the Federal Land Bank of St. Paul, as lessor, which was recorded in the office of the register of deeds of Williams County May 18, 1951.

The pleadings disclose that the issues in this case arise between Lawrence Pederson and his lessee, Hunt Oil Company, on the one hand, and the Federal Land Bank of St. Paul and its lessee, Amerada Petroleum Corporation, on the other. The trial court rendered judgment quieting title in the plaintiff to the entire property against the

claims of the defendants, except that of the Hunt Oil Company which was adjudged to be the owner of a valid and subsisting oil, gas, and mineral lease. The Federal Land Bank of St. Paul and the Amerada Petroleum Corporation appeal.

In 1913 Olaf T. Hoaas became the owner of the land involved in this action. On November 7, 1917, he executed a mortgage to the Federal Land Bank of St. Paul. On December 11, 1934, the land was sold to the County of Williams for unpaid taxes levied in 1933. On August 6, 1942, Olaf T. Hoaas and Pettrine Hoaas, his wife, conveyed the land to the Federal Land Bank of St. Paul by quitclaim deed which was recorded March 8, 1946. On the same date the mortgage was satisfied of record by recording a release of mortgage that had been executed by the Federal Land Bank of St. Paul on December 15, 1942. On October 1, 1942, an auditor's tax deed was issued to Williams County and recorded October 10, 1942.

On November 14, 1942, the plaintiff Lawrence Pederson signed an offer to purchase the bank's interest in land which was addressed to the Federal Land Bank of St. Paul on a printed form in which the names, description, and consideration were inserted on the typewriter. The offer was for the sum of $75. The printed form following the description provided:

"Excepting and reserving to the Bank and its successors and assigns fifty percent (50%) of all right and title in and to any and all oil, gas and other minerals in or under the foregoing described land with such easement for ingress, egress and use of surface as may be incidental or necessary to use of such rights."

Then followed in black type this statement:

"It is expressly understood that this offer is for only such right, title, and interest as the Bank may have in said land."

On the back of this instrument, and following a number of provisions that have no bearing on this case, there appears this provision in black type:

"I fully understand that the Bank may not own all or any mineral rights in the real estate described herein, and that any provisions herein with respect to mineral rights to be included in the sale have reference to only such mineral rights as the Bank owns, as disclosed by the public records."

Near the end the printed form was filled out as follows:

"I was induced to make this offer at the solicitation of * * * Calvin Olson (Fieldman of Federal Land Bank) * * *."

The instrument was witnessed by Calvin Olson. On November 23, 1942, the Federal Land Bank wrote the plaintiff stating that his offer

"has been accepted by this bank in accordance with the terms outlined by you, with the understanding that the Bank will issue a quitclaim deed and will not be responsible in any way for title or tax situation.

"You have been informed that Williams County has taken tax title to the tract which you are purchasing, and the Bank, by accepting your offer and agreeing to quitclaim, relinquishes its right to demand reconveyance from the County upon payment of the accrued taxes and thereby authorizes you to arrange for your own conveyance from the County."

On November 30, 1942, the Federal Land Bank executed a deed purporting to "Convey and Quit Claim" to the plaintiff the land herein involved,

"Excepting and reserving to the Bank and its successors and assigns 50% of all right and title in and to any and all oil, gas and other minerals in or under the foregoing described land, with such easement for ingress, egress and use of surface as may be incidental or necessary to use of such rights.

The foregoing exception and reserva-tion (if any) and the resulting remainder of mineral rights to be included in the sale (if any) shall each and all be with reference only to such mineral rights as the Bank may own, as disclosed by the public records."

On November 14, 1942, the plaintiff signed an application addressed to the county commissioners of Williams County to repurchase the land for two hundred dollars, the appraised value thereof, as the successor in interest of the former owner. The application with the Federal Land Bank's letter of November 23 attached is in the office of the county auditor of Williams County. The board of county commissioners of Williams County acted favorably upon the plaintiff's application and on January 11, 1943, he entered into a contract for deed with the county. This contract was fulfilled and on January 29, 1946, the county issued its deed whereby it did grant, bargain, sell, and convey to the plaintiff the land in question. This deed contains no exceptions or reservations.

■ When the tax deed was issued to Williams County on October 1, 1942, it conveyed to the county "the absolute property in fee to the county, free from all encumbrances whatsoever." Section 57–2809, NDRC 1943. This deed vested in the county a new, complete, and paramount title under an independent grant from the sovereign authority which extinguished all prior titles. Ulrich v. Amerada Petroleum Corp., N.D., 66 N.W.2d 397; Baird v. Stubbins, 58 N.D. 351, 226 N.W. 529, 65 A.L.R. 1009; State v. Griggs County, 72 N.D. 587, 10 N.W.2d 245; Peterson v. Reishus, 66 N.D. 436, 266 N.W. 417, 105 A.L.R. 724; Nelson v. Murton, 68 N.D. 108, 277 N.W. 390; Buman v. Sturn, 73 N.D. 561, 16 N.W.2d 837; Coverston v. Grand Forks County, 74 N.D. 552, 23 N.W. 2d 746; Northwestern Mutual Savings & Loan Association v. Hanson, 72 N.D. 629, 10 N.W.2d 599; Conlin v. Metzger, 77 N.D. 620, 44 N.W.2d 617.

After its title had been extinguished and on November 30, 1942, the Federal Land Bank gave to Lawrence Pederson a quitclaim deed containing the reservation heretofore quoted. At that time the only right which the Federal Land Bank had with respect to the land was such right as it might assert under Section 19, Chapter 286, SLND 1941, which provides:

"The owner, or his successor in interest, shall have the right to repurchase all real estate heretofore or hereafter, forfeited to the county under tax deed proceedings, so long as the tax title thereto remains in the county. Such purchase may be for cash or upon contract for deed made by and between the Board of County Commissioners and the owner, or his successor in interest. The consideration of such contract shall include: (1) The total amount required to be paid in the notice to effect a redemption. (2) The total amount of all subsequent taxes with interest, penalties and costs. Provided that if the fair market value of such property at the time of the repurchase thereof, is less than the total amount to be paid to effect a redemption, together with all subsequent taxes, interest, penalties and costs, the Board shall fix a fair and just sales price for such property, and shall require the owner to pay at least twenty-five (25%) percent of the total contract in cash and the remainder shall be payable in not to exceed ten (10 annual equal installments as the Board of County Commissioners may determine, which installments shall bear interest at four (4%) percent per annum until paid in full. Such contract shall further provide that if the vendee or his successor in interest, fails to pay one or more of the installments, when due with interest, the Board of County Commissioners may cancel such contract and thereupon all payments and improvements made by the vendee or his successor in interest, shall be forfeited to the county as liquidated damages for breach of contract unless otherwise expressly provided. That upon the full per-

formance of such contract, the county shall execute and deliver a deed to the purchaser which shall be executed in the same manner as tax deeds and shall have the same legal effect as prescribed by the terms of this Act."

The right of a former owner or his successor in interest to repurchase land, title to which has been lost to the county through tax deed proceedings, first appeared in Chapter 238, SLND 1939. Concerning that right we said:

"That statute has no connection with or effect upon the vesting of title in the county. It confers an additional right (erroneously designated as a right of redemption) upon the former owner, making him a preferred purchaser without profit to the county. It is a special statute giving him a second chance as a special act of grace." Buman v. Sturn, 73 N.D. 561, 16 N.W. 2d 837, 842.

The law thus stated has been approved in later cases under later statutes. See Ulrich v. Amerada Petroleum Corp., N.D., 66 N.W.2d 397, and cases cited therein. In that case we held that the statute giving the former owner the additional privilege of repurchase did not thereby grant to him a vested interest in the property. This is also the holding of Yates v. Hawkins, 46 N.M. 249, 126 P.2d 476.

■ In view of the fact that the issues in the case arise out of the reservation in the quitclaim deed given by the Federal Land Bank after it had lost absolute title to the county and at a time when its only right was one of repurchase, further consideration of the nature of that right is appropriate. A study of the statute discloses that right of repurchase is restricted to the owner or his successor in interest. It is expressed in the singular and in the alternative. The question naturally arises: Is it a right that is divisible by being split up into separate interests or rights or is it a right which can be exercised by the owner alone or by him transferred once and in toto? Or viewing it from the standpoint of the county, can the county be compelled to sell through separate transactions to the owner and a successor or numerous successors in interest? The section of the statute in question contemplates but one contract of sale which must include the total amount due the county for taxes, interest, penalties, and costs or, in other words, what the county has invested in the land. But if the fair market value of the property is less than the amount the county would be entitled to as its investment at the time of repurchase, the commissioners have the power to fix a fair and just sales price of the property. The wording of this provision contemplates clearly the sale of all of the property and not a sale in parts. The county commissioners have power to make but one sale and that is a sale of all of the property.

The right conferred by the repurchase statute is in the nature of an option.

■ "An option to purchase property is a mere privilege given by the owner to the optionee and does not constitute the optionee a purchaser of said property nor give him any right to or interest in the property until he accepts that privilege by exercising his right of option within the time specified and before it is cancelled." Larson v. Wood, 75 N.D. 9, 25 N.W.2d 100, 101. Also Hultberg v. City of Garrison, N.D., 56 N.W.2d 319.

In MacRae v. MacRae, Tex.Civ.App., 144 S.W.2d 320, 324, the court considered a Texas statute providing for forfeiture of the sale of state public school land for nonpayment of interest and providing that upon forfeiture the original purchaser could have the land reappraised and could repurchase it. The court held that the original purchaser's right in and to the land was terminated except for the preference right of repurchase and said:

"This right was in the nature of an option. It is clear this right was not a title. Save as above stated, his right in and to the land was terminated by such forfeiture."

To the same effect: Boykin v. Southwest Texas Oil & Gas Co., Tex.Com.App., 256 S.W. 581.

The deed given by the Federal Land Bank to the plaintiff purports to convey and quitclaim to him the land in question. It indicates an intention to convey to the plaintiff the right of repurchase. This intention is further indicated by other evidence which we will discuss later. The right of repurchase, being indivisible, was not subject to being excepted or reserved to the grantor in part. The deed conveyed the entire right of repurchase to the plaintiff who thereby became the successor in interest of the owner, the Federal Land Bank. The significance of the exception and reservation in this deed diminishes when we consider the fact that it was a clause employed at that time by the bank in preparing all deeds and contracts for deeds.

■ The subject of the reservation or exception must be out of the thing conveyed. Thornhill v. Ford, 213 Miss. 49, 56 So.2d 23; Phillips v. Johnson, 202 Okl. 645, 217 P.2d 520; 16 Am.Jur., Deeds, Section 298; 26 C.J.S., Deeds, § 139. The Federal Land Bank had no title to the land at the time it gave a quitclaim deed. It therefore could reserve or except no part of the land. Its only right was that of repurchase from the county, no part of which was subject to exception or reservation. The entire right of repurchase passed to Pederson. This was clearly the understanding that the bank had of the transaction when in its letter to Pederson it said:

"and the Bank, by accepting your offer and agreeing to quitclaim, relinquishes its right to demand reconveyance from the County upon payment of the accrued taxes and thereby authorizes you to arrange for your own conveyance from the County."

The appellants argue that if it is held that the quitclaim deed did not reserve to the bank an interest in real estate, it nevertheless constituted a contract between the grantor and grantee which gave to Pederson the right to repurchase the land subject to the reservation and when the repurchase was consummated the Federal Land Bank became, in equity, the owner of fifty per cent of the mineral rights. It is further asserted that the bank became the owner of fifty per cent of the minerals by an implied grant from the plaintiff. It is also argued that the deed from the county to the plaintiff created a cotenancy with the bank and the plaintiff as cotenants. Other arguments presented by the appellants are that the deed from the county to the plaintiff created a constructive trust under which the plaintiff held fifty per cent of the minerals for the benefit of the bank and that the plaintiff is estopped to deny the validity of the reservation or the bank's title to fifty per cent of the minerals. Much of appellants' argument is based on the erroneous assumption that the right to repurchase is an interest in real estate which is divisible by creating severances through conveyances or reservations and exceptions of interests in the real estate itself.

The appellants' most potent argument, if borne out by facts, is set forth in the bank's brief as follows:

"the Bank was the owner of a valuable right with respect to the minerals, as well as with respect to all other interests in the land. That was the right to repurchase said mineral rights along with the surface and all other interests. The parties to the transaction understood that and contracted with that fact in mind. The Plaintiff contracted that if the Bank would place him in a position to repurchase the property in accordance with the statute, the Bank would be the owner of one-half of the mineral rights in said property."

In support of this contention Greene v. White, 137 Tex. 361, 153 S.W.2d 575, 583, 136 A.L.R. 626, is cited and emphasized. In that case the court applied the rule that the grantee in a deed accepted by him is a party to the deed even though he does not sign it and he is concluded by the recitals in the deed and by reservations contained therein in favor of the grantor. The court further held that assuming the grantor's

lack of title to the land which he undertook to convey to the grantee by deed poll with express reservations of a vendor's lien, certain timber rights, and all minerals, such lack of title in the grantor would not prevent the reservations from being contractually binding upon the grantee. It should be noted that the reservations in that case were rights or interests which were separable or severable from the thing granted or transferred. They were rights which were properly the subject of exception or reservation. Here the only thing involved is the entire and inseparable right to repurchase all of the property. As a transfer of that right to the plaintiff the quitclaim deed did not and could not reserve to the grantor a separate right of repurchase. As to the right of repurchase it was a transfer to the plaintiff of all or nothing. The deed conveyed all. The clause on which the appellants rely reserved nothing that was subject to exception or reservation. In Greene v. White, supra, the reservation involved rights that could have been reserved if the grantor had title. In this case the bank had only the right of repurchase which was the only thing that the parties intended should be conveyed to the plaintiff, no part of which could be reserved.

The deed involved in Greene v. White, supra, was the result of a compromise settlement of a disputed title. The opinion states:

"While Alex Garrett did not sign the deed, he was a party to it as grantee, and further became a party to the deed and contract by executing the vendor's lien notes given as purchase money. The terms, provisions and obligations of the deed are in our opinion, subject to qualification as hereinafter made on account of the homestead question, binding upon both of the parties to it. The instrument is contractual in nature, representing and setting forth the agreement of the grantor and the grantee as to what the interests, rights and obligations of said parties shall thereafter be with respect to the land. It was executed in settlement of conflicting claims of the parties. Garrett was in possession of the land, claiming to have acquired a right or title to it by possession. The right or title claimed by him was not evidenced, however, by any formal or final determination of the sufficiency of his possession to give him a limitation title. The evidence in the record as to his possession up to that time is such that the question of its sufficiency was a question of fact, subject to determination either for or against him by a court or jury. Greene's claim of title to the land was also at that time subject to dispute and to the hazard of a decision of the facts against him. He had record title to the land through the deed from Huffhines, if the land was within the bounds of the Davenport survey, but the evidence does not conclusively show that it was so located. In this situation, the deed was executed, setting out the agreement of the parties that Garrett should pay to Greene a stated sum evidenced by notes, that thereafter the title to the surface should be in Garrett and the title to the minerals and merchantable timber in Greene, the latter warranting to defend the premises unto Garrett against all claims."

The contract in that case is clear, unambiguous, and subject to but one construction. The reservation contained in the deed was also concise, clear, and definite and operated with respect to rights and interests which were proper subjects of reservation. This is not the situation here.

■■ In an attempt to show that the bank comes within the purview of Greene v. White, supra, it is argued that this record shows that the quitclaim deed was the result of a contract to convey to Pederson the bank's right to repurchase the land at private sale and that as a part of that contract the parties agreed that one-half of the minerals would be owned by each. If it were shown clearly that the parties intended to make such a contract and did in fact make such a contract pursuant to

which the quitclaim deed was executed and delivered, equity would afford the bank relief. The burden of proof is on the bank. The relief it seeks is in the nature of specific performance. Before equity will grant such relief, the contract under which the relief is sought must be clearly and definitely established. 49 Am.Jur., Specific Performance, Section 169; 81 C.J.S., Specific Performance, § 143.

It should also be noted that the reservation was limited "to such mineral rights as the Bank may own." Ordinarily the term "mineral right" implies an interest in minerals, including oil and gas. See Sheppard v. Stanolind Oil & Gas Co., Tex.Civ. App., 125 S.W.2d 643; Schlittler v. Smith, 128 Tex. 628, 101 S.W.2d 543. The bank seems to have been in doubt as to whether it had any mineral rights, either to sell or reserve, for it added to its reservation this proviso:

"The foregoing exception and reservation (if any) and the resulting remainder of mineral rights to be included in the sale (if any) shall each and all be with reference only to such mineral rights as the Bank may own, as disclosed by the public records."

This provision would hardly have been placed in the deed to guard against spectral liabilities. It applies to minerals reserved as well as to minerals sold. At the time the deed was made the bank had no mineral rights as that term is commonly understood to either sell or reserve. We see in the reservation and its accompanying provision no evidence of an agreement by Pederson to repurchase the property in his own name and then convey fifty per cent of the minerals to the Federal Land Bank. If he did not so agree, this court will not in effect make a conveyance for him by decreeing the Federal Land Bank to be the owner of one-half of the minerals.

To sustain its position the bank goes back to the purchase agreement which contains the same reservation as does the deed and urges that it is further evidence

that the bank was to own fifty per cent of the minerals after Pederson had repurchased from the county. This reservation is subject to infirmities similar to those affecting the reservation in the deed. It is suggested that these reservations must have been inserted for a purpose and that the only purpose could be that the parties agreed that after the repurchase the bank was to own half of the minerals and that the reservations establish that this was the intention of the parties to which a court of equity should give effect. There are, however, two other possible explanations. One is that it was the policy of the Federal Land Bank to insert such reservations in agreements and conveyances pertaining to the sale of its lands and that the agents of the bank pursued the usual policy in this case as a matter of course. If that be the explanation, it does not indicate a special agreement between the bank and Pederson that after Pederson repurchased from the county and obtained from it absolute title the bank should nevertheless own and be entitled to have conveyed to it fifty per cent of the minerals. The instruments prepared by the bank in this case contain so many carefully worded safeguards against possible liabilities that it is fair to assume that if the bank intended to claim the right now asserted in its behalf which is not covered by the usual provisions, reservations, and covenants of its instruments it would have provided for the affirmative right to have fifty per cent of the minerals conveyed to it after repurchase.

A second alternative explanation for the insertion of the reservations in the agreement to purchase and in the quitclaim deed, being the one adopted by the trial court in his memorandum opinion, is this: Many county tax deeds are void because of defects in the proceedings leading up to their issuance. In event the tax deed proceedings were void the county would have no title, the title would remain in the Federal Land Bank. In this event the quitclaim deed would be a valid conveyance of the bank's title and the reservation would be as valid and effective as that of any

other conveyance executed according to the established policy of the bank. All of the mineral rights, as well as the surface, would be owned by the bank and disclosed by the public records. The mineral rights would then be conveyed and reserved according to the terms of the agreement of purchase and the deed and no repurchase from the county would be involved. In other words, the reservation was intended to be exactly what it purports to be, a reservation of fifty per cent of the mineral rights the bank then owned as disclosed by the public records.

We again refer to the letter from the bank to Pederson accepting his offer to purchase in which the bank further disclaims its responsibility for title or taxes. It states that by agreeing to quitclaim it relinquishes its right to demand conveyance from the county. Here again the bank shows concern for its possible liabilities against which it has so carefully guarded, yet makes no reference to the right which it now claims, to have title to a part of the property that Pederson was to obtain from the county conveyed to the bank after repurchase.

It is strongly urged that equity impels us to hold that the bank is the owner of fifty per cent of the minerals on the ground of estoppel. There is no intimation of fraud, misrepresentation, or concealment on the part of Pederson in connection with the transaction. He did nothing to mislead the bank. It had at least an equal opportunity with Pederson to know all of the facts as well as the law involved. Under such conditions there can be no estoppel. 19 Am.Jur., Estoppel, Section 87; 31 C.J.S., Estoppel, § 90; Pomeroy's Equity Jurisprudence, Fifth Edition, Sections 807, 821; Mott v. Nardo, 73 Cal.App.2d 159, 166 P.2d 37.

The general equities of this case do not favor the bank. Pederson received no unconscionable bargain. Prior to his repurchase the fair market value of the property was determined by appraisement to be two hundred dollars. That was all

of the property, including all the minerals. He had already paid the Federal Land Bank seventy-five dollars for its right of repurchase. He paid two hundred seventy-five dollars for property of the fair value of two hundred dollars. The transaction has not resulted in unjust enrichment of the plaintiff. The appellants have failed to establish a valid reservation of an interest in the property and have not proved a contract under which, in equity, the Federal Land Bank of St. Paul would be entitled to a judgment declaring it to be the owner of fifty per cent of the minerals. The judgment is affirmed.

BURKE, C. J., and SATHRE, JOHNSON and GRIMSON, JJ., concur.